## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROBERT D. TURNER,

    Plaintiff,

v.

                       Civil No. BAH-24-3448

ASRESAHEGN GETACHEW,

    Defendant.

### MEMORANDUM OPINION

On November 26, 2024, self-represented Plaintiff Robert D. Turner ("Turner" or "Plaintiff") filed a civil complaint pursuant to 42 U.S.C. § 1983, alleging denial of medical care. ECF 1 ("complaint"). Defendant Asresahegn Getachew, M.D. ("Dr. Getachew" or "Defendant"), filed Motions to Dismiss, or in the Alternative, for Summary Judgment. ECF 15, 17.[1] Turner was advised of his opportunity to respond to both dispositive motions and warned of the risks of failing to do so, including dismissal. ECFs 16, 18. Turner filed a short response in opposition, which was docketed as a "supplement" to his complaint. ECF 19. The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2025). For the reasons stated below, Defendant's Motions are GRANTED.

## I.    BACKGROUND

### A.  Turner's Allegations

---

[1] The motions and memoranda in support are identical but have different attachments. The Court will reference ECF 17 and its attached memorandum in support at ECF 17-1. Attached to ECF 17 is a declaration by Dr. Getachew as well as portions of Turner's medical records. *See* ECF 17-2 (Getachew Declaration); ECF 17-3–17-15 (Medical Records).

Turner, an inmate currently incarcerated at North Branch Correctional Institution ("NBCI"), initiated this action on November 26, 2024, by filing a pro se civil rights complaint pursuant to 42 U.S.C. § 1983. ECF 1. Turner alleges that on December 12, 2018, Dr. Getachew agreed that Plaintiff could have knee surgery if Plaintiff went six months without cutting himself. *Id.* at 2–3. Turner states that he last cut himself on January 23, 2023, but has still not had the surgery. *Id.* Turner also alleges that he is supposed to have his pacemaker checked every six months, but Dr. Getachew refuses to schedule the checks. *Id.* at 3. Lastly, Turner alleges that he had open heart surgery on April 14, 2023, to repair two heart valves that were damaged from a blood infection. *Id.* Turner states that he was supposed to have a cardiogram to check his heart valves, but he alleges that Dr. Getachew refuses to schedule it. *Id.* Turner asserts that the failure to schedule these procedures exacerbates his physical and mental health issues. *Id.* at 4.

In his response to Defendant's Motion, Turner states that he went to the hospital in July of 2017 for knee surgery, but the surgery did not occur because his "EKG showed a second degree heart block and other rhythms." ECF 19, at 1. Turner alleges he was told that he needed a new pacemaker before the knee surgery could take place. *Id.* In December of 2017, Turner says he received a new pacemaker. *Id.* However, Turner alleges that Dr. Getachew again refused to schedule the knee surgery because "[Turner] cut [him]self on Tuesday, December 25, 2018." *Id.* at 2. Turner seeks injunctive relief, specifically that his knee surgery, pacemaker testing, and cardiogram be scheduled. ECF 1, at 5–7; ECF 19, at 2. He also seeks compensatory damages. ECF 1, at 5 (seeking $500,000); ECF 19, at 2 (seeking $250,000).

**B. Dr. Getachew's Response**

Defendant filed motions seeking dismissal of the complaint or, in the alternative, summary judgment. ECF 17-1. Dr. Getachew argues that (1) the complaint should be dismissed because

Turner's claim regarding knee surgery is barred by the doctrine of *res judicata*; *id.* at 15-19, and (2) Dr. Getachew is entitled to summary judgment on Turner's claims regarding his pacemaker and the scheduling of a cardiogram, *id.* at 19-21.

In his affidavit, Dr. Getachew states that from January 1, 2019, until January 11, 2020, he was employed by Corizon Health Inc., ("Corizon") at Baltimore Central Booking and Intake Center until he transferred to Western Correctional Institution ("WCI"), where he also sees patients from NBCI via telemedicine. ECF 17-2, at 2 ¶ 4. Dr. Getachew states that he was not Turner's primary care provider but did see him occasionally for telemedicine chronic care visits. *Id.*

As to Turner's concerns regarding the care he received for his heart condition, Dr. Getachew states that Turner no longer has a pacemaker and therefore does not need pacemaker checks and that his heart was otherwise "checked and is functioning well." *Id.* at 2–3 ¶ 6. Further, Dr. Getachew explains that he is not a member of Utilization Management ("UM") and does not review consultation requests or schedule offsite visits. *Id.* at 17 ¶ 43. Dr. Getachew attests that he had no involvement in any delay in Turner seeing a cardiologist or having an echocardiogram. *Id.*

Dr. Getachew avers that he never disregarded or ignored Turner's medical needs. *Id.* at 23 ¶ 57. He explains that Turner does not need pacemaker interrogations because he does not have a pacemaker, which Dr. Getachew says has been explained to Turner on a number of occasions. *Id.* Additionally, "[p]er the most recent cardiology visit," Dr. Getachew says "there are no further cardiac tests to offer [Turner] and he has no present or active cardiovascular issues." *Id.* Dr. Getachew says that Turner continues to have access to medical care through sick calls and chronic care visits, and all Turner's medical issues are being treated. *Id.*

Turner's medical records—which Turner does not challenge the authenticity or accuracy of—show that, relative to the treatment he received for his cardiac conditions, Nurse Practitioner

3

("NP") Clark evaluated Turner on July 13, 2019, in the WCI infirmary, and noted that Turner had an interrogation of his pacemaker and the settings were adjusted. ECF 17-6, at 19–21. On December 18, 2019, Dr. Andrew Moultrie evaluated Turner for chronic care and recounted Turner's history of heart block which required a pacemaker. *Id.* at 12. Records reflect that Turner did not complain of chest pains or palpitations and it was noted that Turner was due for a pacemaker interrogation the following month. *Id.* at 12–15.

On July 22, 2020, Dr. Getachew saw Turner via telemedicine for chronic care. ECF 17-5, at 35; ECF 17-6, at 1. Dr. Getachew noted Turner's medical conditions including "hypertension and sick sinus syndrome with pacemaker" and noted that the last "pacemaker interrogation" was in December. ECF 17-6, at 1-2. Turner was referred to Cardiology for "evaluation and pacemaker interrogation." *Id.* at 2.

On March 3, 2021 and April 1, 2021, Dr. Getachew saw Turner via telemedicine for chronic care. ECF 17-5, at 27–30. Among other things, Dr. Getachew addressed Turner's sick sinus syndrome and heart block. *Id.*

On September 9 and 20, 2021, Dr. Getachew saw Turner via telemedicine for chronic care and addressed a number of issues including cardiac issues. ECF 17-5, at 17–20. At the September 20, 2021 evaluation, Turner presented with abnormal labs indicating hyponatremia (low sodium) and reported episodes of diarrhea and vomiting. *Id.* at 17–18. Dr. Getachew had Turner admitted to the infirmary to repeat a metabolic panel and for observation. *Id.*

On November 16, 2021, Dr. Getachew saw Turner via telemedicine for chronic care and submitted a consultation request for a pacemaker interrogation. *Id.* at 15–16.

On May 10, 2022, Dr. Getachew saw Turner via telemedicine for chronic care and addressed, among other things, Turner's cardiac issues. ECF 17-3, at 29. Dr. Getachew also

reviewed Turner's labs and medications. *Id.* at 29–32. After Dr. Getachew evaluated Turner on October 13, 2022, via telemedicine for chronic care, Dr. Getachew noted Turner's last pacemaker interrogation was July 6, 2022, and that he would request a consultation for another one. *Id.* at 1–4; ECF 14-4, at 29–34.

On March 5, 2023, Physician Assistant Francis Oluwo at Jessup Regional Infirmary (JRI) saw Turner after he returned from Johns Hopkins Hospital ("JHH") following an extensive stay for endocarditis (a heart infection) from methicillin-susceptible Staphylococcus aureus ("MSSA") bacteremia. ECF 17-4, at 8–12. Dr. Getachew summarizes Turner's hospitalization as follows: "[Turner] had presented to the hospital with three days of fevers and other nonspecific symptoms, found to have MSSA bacteremia/infective endocarditis with vegetations of his mitral valve, tricuspid valve, and pacemaker leads, septic pulmonary emboli and acute kidney injury ("AKI")." ECF 17-2, at 15 ¶ 32. Dr. Getachew explains that vegetations are masses that can form on heart valves and devices due to infection, and they can lead to complications like embolization and sepsis. *Id.* Turner was transferred to JHH Progressive Cardiac Care Unit General Cardiology for further management. ECF 17-4, at 8. Turner's antibiotics were switched from Cefazolin to Oxacillin, and it was noted that he would need permanent pacemaker lead and device removal once his chest x-ray was negative for infection for 48 hours. *Id.* It was also noted that the pacemaker might be replaced with a Miniaturized, Implantable, Cardiac Rhythm Advisor ("MICRA"). *Id.*

On April 3, 2023, records reflect that Turner's pacemaker site was swollen. *Id.* at 34. As a result, Turner was sent back to JHH. *Id.* at 5–6. The following day, Turner had a CT scan which showed "a pseudoaneurysm off a branch of the [left] subclavian artery." *Id.* at 2. Dr. Getachew explains that a "pseudoaneurysm is a bulge in the artery wall caused by blood leaking out of the

vessel and becoming walled off by surrounding tissue" that "can develop from trauma." ECF 17-2, at 13 ¶ 33. Dr. Getachew also notes that he is "aware that it was reported by other inmates that [Turner] was punching himself repeatedly in the pacemaker site, which likely caused the pseudoaneurysm." *Id.*

On April 6, 2023, while at JHH, Turner was diagnosed with recurrent endocarditis and hypervolemia (fluid overload) due to end-stage renal disease. ECF 17-4, at 1. Dr. Getachew notes that it was not clear why Turner developed these infections given that he had been changed to a leadless pacemaker. *Id.*; *see also* ECF 17-2, at 13 ¶ 34. However, records reflect that "[i]t is possible that [Turner] did not complete his antibiotics and [a] residual infection in [the] tricuspid and mitral valve persisted." ECF 17-4, at 1. Another possibility was that Turner developed a new infection of the leadless pacemaker. *Id.* Without positive cultures, JHH planned to treat Turner as having MSSA endocarditis. *Id.* Turner's presentation raised concerns as to whether a permanent pacemaker was an appropriate device for him and whether the infection could be treated with the pacemaker in place. *Id.*

On April 11, 2023, a transesophageal echocardiogram "confirmed vegetation" and a retained pacemaker lead. ECF 17-11, at 20. On April 14, 2023, Turner had open heart surgery to repair the mitral and tricuspid valves and to remove the retained pacemaker lead. *Id.* at 19. On April 18, 2023, the JHH cardiologist noted that Turner was not dependent on the pacemaker and was in stable sinus rhythm. *Id.* at 18. In light of Turner's recurrent infections and that "less is likely more with respect to hardware," the cardiologist determined that he would not replace the generator unless required to do so based on telemetry monitoring with "a Zio patch." *Id.*

On April 25, 2023, Certified Registered Nurse Practitioner ("CRNP") Doctor of Nursing Practice ("DNP"), Ashleigh Boidock saw Turner for discharge from JHH. ECF 17-13, at 35; ECF

17-14, at 1–11, 35. Boidock recounted Turner's treatment in the hospital and noted Turner was discharged without a pacemaker but with a Zio patch to monitor his heart rhythm for 14 days. ECF 17-14, at 3. Turner was to continue on IV antibiotics until May 25, 2023, and was to continue on a suppressive antibiotic indefinitely due to having a retained wire in the right ventricle. He was also to continue a diuretic until his cardiac surgery follow-up. *Id.* at 4. Upon his discharge from JHH, Turner was admitted to JRI for continuing care. *Id.* at 1–11.

On May 8, 2023, Turner's PICC line to the chest was clogged and he complained of shortness of breath and chest pain while on oxygen. ECF 17-11, at 12–14. He returned to JHH emergency room ("ER"). *Id.* The following day, Turner's chest x-ray showed new opacities, which were likely pulmonary edema. *Id.* at 11. On May 10, 2023, Turner was hypoxic and had fluid overload. *Id.* at 10. His recent cardiac history was noted and he was discharged back to JRI. ECF 17-12, at 27–35; ECF 17-11, at 5–7.

On May 19, 2023, CRNP Clarice Aryiku submitted an urgent consultation request for a Cardiology follow-up with Dr. James Ladd, which Utilization Management approved on May 23, 2023. ECF 17-11, at 2–3; ECF 17-14, at 12–17. Turner was originally scheduled to see the Cardiologist on May 26, 2023, but that visit was cancelled; additional visits scheduled for June 16, 2023, August 4, 2023, December 17, 2023, and February 8, 2024 were also rescheduled. ECF 17-14, at 12. Dr. Getachew avers that based on his record review, the appointments were missed due to an issue with JHH scheduling and/or Turner being in court. ECF 17-2, at 15 ¶ 37. Turner was finally seen by the Cardiologist on February 27, 2024. ECF 17-14, at 12–13.

On June 6, 2023, Turner reported shortness of breath and was sent via ambulance to St. Agnes Hospital ER. ECF 17-10, at 34–35; ECF 17-11, at 1. He was admitted to the hospital and diagnosed with chronic heart failure ("CHF") exacerbation and acute respiratory failure with

7

hypoxia . ECF 17-12, at 14–24. He was discharged to JRI on June 11, 2023. ECF 17-10, at 29–33.

Turner was scheduled for cardiology follow up on June 16, 2023, but there is no record in Turner's chart that he was seen that day. ECF 17-14, at 12–13. On July 25, 2023, Turner had chest x-rays, which showed the pacemaker had been removed. ECF 17-11, at 26–28. On August 28, 2023, Turner was discharged from JRI back to NBCI. ECF 17-10, at 27–28.

On October 6, 2023, Dr. Susan Arnoult evaluated Turner for chronic care. ECF 17-10, at 20–26. Dr. Arnoult noted that Turner tried to remove his pacemaker leads, which led to significant endocarditis. *Id.* at 20. Turner was hospitalized and underwent valve repairs and the placement of a permanent lead in the heart. *Id.* The cardiologists recommended a repeat ECHO and lifelong antibiotics. *Id.* At the time of this examination, Turner did not have any complaints of cardiac issues. *Id.*

On October 25, 2023, Dr. Arnoult evaluated Turner for edema/CHF. ECF 17-10, at 14–19. Dr. Arnoult again noted Turner's extensive history of endocarditis and valve repair. *Id.* at 14. It was noted that Turner weighed 175 pounds in August 2023, but now weighed 190 pounds. *Id.* Dr. Arnoult increased Turner's diuretic for 10 days but it did not help. *Id.* Dr. Arnoult also noted that no cardiac follow-up had been done and sent an urgent consultation request for Cardiology/ECHO. *Id.* at 11; ECF 17-14, at 18–30. Records reflect that health care professionals requested the cardiology evaluation note and echocardiogram results from August 4, 2023 for review. ECF 17-14, at 18. However, it was discovered that Turner had not attended a scheduled echocardiogram and follow-up cardiology appointment, and so a request was then submitted for rescheduling. *Id.* at 12–13, 18.

On November 2, 2023, Turner had chest x-rays which showed retained wires and leads but no radiographic evidence of acute cardiopulmonary disease. ECF 17-11, at 31.

Dr. Getachew evaluated Turner on December 7, 2023, via telemedicine for chronic care. ECF 17-10, at 1–7. Relative to his heart failure, Turner complained of progressive shortness of breath, dyspnea on mild exertion, orthopnea, paroxysmal nocturnal dyspnea, and leg swelling. *Id.* at 1. Dr. Getachew noted Turner's history of endocarditis due to an infected pacemaker for which he was hospitalized and diagnosed with moderate pericardial effusion. *Id.* Dr. Getachew noted that during Turner's hospitalization he required dialysis because of post infectious glomerulonephritis that caused acute kidney injury. *Id.* Dr. Getachew also noted that Turner had gained weight since the last visit and had symptoms suggestive of heart failure. *Id.* at 1–2. Dr. Getachew therefore directed Turner's admission to the infirmary for better evaluation. *Id.* at 2; ECF 17-9, at 32–35. Turner's December 12, 2023, chest x-rays showed retained wires and leads within the chest as well as blunting of the lateral sulci, which suggested trace effusions. ECF 17-11, at 32.

On December 15, 2023, Dr. Getachew again saw Turner via telemedicine for chronic care. ECF 17-9, at 26–31. Turner reported feeling better but still had some congestion. *Id.* at 26. He reported no chest pain, and exhibited no orthopnea, paroxysmal nocturnal dyspnea, or leg swelling. *Id.* Regarding his history of congenital AV block, Dr. Getachew noted he was post-pacemaker implantation with multiple lead revisions due to self-induced pacemaker damage and infection. *Id.* Dr. Getachew recounted Turner's JHH hospital admission and course of treatment from February 2023 and noted that the cardiologist advised biannual pacemaker interrogation. *Id.* at 26–27. Dr. Getachew submitted a consultation request for a pacemaker interrogation, *id.* at 27, which was approved on January 29, 2024, *see* ECF 17-9, at 18–25; ECF 17-4, at 31–35; ECF 17-

15, at 1–12. However, Turner was out for court and missed the appointment on February 8, 2024. ECF 17-2, at 18–19 ¶ 47; ECF 17-14, at 31.

Turner was not able to attend the rescheduled appointment on February 21, 2024, which records reflect was because he was on suicide watch, and he was rescheduled for April 3, 2024. ECF 17-2, 18–19 ¶ 47. On April 3, Turner attended the appointment, but UPMC Cardiology sent a note back stating "that the interrogation guy was not able to make a connection." *Id.* Medical staff reviewed Turner's JHH notes from February 27, 2024, and noted that Turner no longer had a pacemaker. *Id.* On April 9, 2024, a notation was made that onsite providers at NBCI were working to get chest x-ray/EKG to confirm whether Turner had a pacemaker. *Id.*

On January 3, 2024, Turner was admitted to UPMC Western Maryland for chest pain. ECF 17-11, at 34–35, ECF 17-12, at 1–11. His chest x-rays showed an embolization coil projected over the lower left lung and postsurgical changes with valvular prosthesis. ECF 17-2, at 19 ¶ 48. Records also showed a blunted left costophrenic angle consistent with pleural adhesions. *Id.* No acute infiltrate or pleural effusion was suspected. *Id.* Turner's potassium was 5.5, his EKG was without changes, and the provider noted she would treat his hyperkalemia with insulin and glucose. *Id.* Turner was diagnosed with chest pain and hyperkalemia. *Id.* Turner's "HEART score" was "2," which Dr. Getachew says is indicative of low risk for a Major Adverse Cardiac Events ("MACE"). *Id.* (indicating that a "[a] HEART score of 0-3 indicates low risk").

Dr. Dhimitri Gross saw Turner on January 10, 2024, for follow-up. ECF 17-9, at 11–17. Turner continued to complain of occasional chest tightness but with less frequency and severity than before and expressed concern about obtaining a cardiology follow-up regarding the pacemaker placed in April 2023. *Id.* at 11. Dr. Gross noted that Turner's pacemaker was removed in February 2023 due to infection. *Id.*

10

On February 27, 2024, Turner saw cardiologist Dr. Jeffrey Trost for follow-up. ECF 17-

11, at 21–25. Dr. Trost recounted Turner's history as follows: "patient was 52 years old with a

history of congenital AV block with pacemaker insertion in 1986 (at age of 14), reportedly with

multiple lead revisions due to self-mutilation and damage to the pacemaker, and several

hospitalizations from February to May 2023 for MSSA bacteremia/endocarditis with subsequent

lead extraction. He reported daily chest pressure since his heart surgery in May 2023." *Id.* at 21.

Dr. Trost further summarized Turner's cardiac history:

> He had hospitalization at JHH 2/12/23 as a transfer from UPMC Western Maryland for
> presumably symptomatic MSSA bacteremia and endocarditis affecting the mitral and
> tricuspid valves as well as TEE evidence of pacemaker lead vegetations, with chest imaging
> suggestive of septic embolic to the lungs. In short, he underwent pacemaker lead extraction
> on 2/16/23 and treated with a 6-week course of IV oxacillin. A moderate pericardial effusion
> was noted at that time. He was discharged back to Cumberland on 3/5/23 but readmitted on
> 4/4/23 with swelling around his pacemaker site (inmates report he was punching himself
> over the pacemaker per notes) and a CT showed a left internal mammary pseudoaneurysm
> for which he subsequently underwent repair with coil embolization. A TTE showed
> persistent vegetation on his mitral valve and he underwent mitral valve and tricuspid valve
> repair on 4/14 with removal of the leadless pacemaker and an RV lead fragment, with
> placement of a permanent epicardial RV wire (Preop coronary angiography showed no
> significant coronary artery disease). An electrophysiologist ("EP") was consulted and felt
> that he did not need pacemaker replacement and was discharged with Zio patch. He was
> discharged on an additional 6-week course of antibiotics on 4/25/23 and readmitted on 5/8/23
> with an obstructed tunneled IV line, chest pain, and shortness of breath. He was thought to
> be hypervolemic with congestive heart failure and was treated with an IV diuretic and
> discharged after one day. Per accompanying paperwork, he underwent a transthoracic
> echocardiogram at UPMC Western Maryland that showed normal LV systolic function,
> normal RV function, no evidence of pulmonary hypertension, and no pericardial effusion.

*Id.* at 21.

Dr. Trost assessed Turner as suffering from persistent chest pain and noted that given his

numerous procedures in 2023, his chest pain was highly unlikely to represent the development of

obstructive coronary artery disease or acute coronary syndrome. *Id.* at 24. Dr. Trost concluded

that it was most likely that Turner was suffering from chronic postsurgical pain. *Id.* Dr. Trost

further concluded that there were no further cardiac tests to offer and recommended that Turner's

providers should consider referral to a pain management specialist if non-opioid medications did not control his pain. *Id.* at 24–25. Dr. Trost also assessed Turner as having experienced pericardial effusion which was resolved as of the December 2023 imaging, and noted that Turner had a history of heart block. *Id.* at 25. Dr. Trost recounted that the 14-day Zio patch showed a Wenckebach block, a benign AV block, with no evidence of an advanced AV block. *Id.* Dr. Trost noted that Turner had not re-presented with symptoms of advanced AV block since his last hospitalization in May 2023. *Id.* Because Turner expressed his belief that he had a pacemaker, Dr. Trost informed him that he no longer had one. *Id.* Dr. Trost advised that he "would be happy to see [Turner] on an annual basis" as "[t]here [were] no present or active cardiovascular issues" at the time. *Id.*

On March 12, 2024, Turner had a chest x-ray which confirmed abandoned pacemaker leads and no evidence of acute cardiopulmonary disease. ECF 17-12, at 12. On March 14, 2024, Dr Getachew saw Turner via telemedicine for chronic care . ECF 17-8, at 24–29. He reviewed the cardiologist's note and recounted that Turner had a benign AV block with no evidence of an advanced AV block. *Id.* at 24. Dr. Getachew further noted that Turner did not require a pacemaker, but Turner remained under the impression he had one. *Id.* Dr. Getachew explained to Turner that Turner did not have a pacemaker and asked the nurse to confirm the information with the cardiologist. *Id.*

Dr. Getachew saw Turner again on April 10, 2024, via telemedicine, to review the cardiologist's note regarding his pacemaker status. ECF 17-8, at 18–23. Turner was still under the impression that he had a pacemaker, but per the cardiologist's report, the pacemaker had been removed. *Id.* at 18. Despite being informed by the cardiologist and Dr. Getachew that he no longer had a pacemaker, Turner "remain[ed] skeptical." *Id.* Dr. Getachew reviewed and addressed Turner's concerns regarding the cardiologist's findings, and Turner indicated he finally understood

12

that he did not have a pacemaker. *Id.* At that time, Turner was taking an antibiotic for infection suppression, and Dr. Getachew requested the nurse clarify with the cardiologist's office the status of the residual wire. *Id.* Dr. Getachew avers that based on his review of the records, this was his last involvement with Turner's care. ECF 17-2, at 23 ¶ 55.

On April 16, 2024, LPN Lori Keister entered a note reflecting that Keister contacted the cardiologist concerning Turner's February 27, 2024, visit. ECF 17-8, at 7. The cardiologist advised that Turner has a lead in his right ventricle that was not able to be removed during his last pacemaker procedure. *Id.* Turner also had a permanent epicardial lead in place. *Id.* On April 23, 2024, LPN Keister wrote a note to Turner, attaching the JHH doctor's notes concerning his pacemaker and the procedures performed and explicitly noting that Turner "no longer [had] a pacemaker." ECF 17-8, at 6.

## II.    STANDARD OF REVIEW

Dr. Getachew argues that the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), or that summary judgment should be granted in Dr. Getachew's favor pursuant to Fed. R. Civ. P. 56. Motions styled in this manner implicate a court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss or "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur as the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

13

Because Defendant explicitly titled his motions as motions to dismiss, or in the alternative, for summary judgment, Turner was on notice that the Court could treat the motions as seeking summary judgment. Accordingly, the Court will review Turner's claims against Defendant under the Rule 56(a) standard and will consider the exhibits filed in support of the dispositive motion.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility

14

determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

The Court is mindful, however, that Turner is a self-represented litigant. A federal court must liberally construe the filings of pro se litigants. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This leniency has its limits, though. "A court may not construct the plaintiff's legal arguments for him, nor is a district court required to recognize 'obscure or extravagant claims defying the most concerted efforts to unravel them.'" *Runge v. Barton*, No. CIVA 6:08-0231-GRA, 2009 WL 3245471, at *1 (D.S.C. Oct. 2, 2009) (first citing *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993); and then quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1277 (4th Cir. 1985)), *aff'd*, 368 F. App'x 361 (4th Cir. 2010). A court cannot assume the existence of a genuine issue of material fact where none exists as any assertion that "a fact cannot be or is genuinely disputed must" be properly supported. *See* Fed. R. Civ. P. 56(c).

## III.  ANALYSIS

Dr. Getachew raises the defense of *res judicata* in support of his argument that he is entitled to summary judgment in his favor as to Turner's claims regarding the denial of knee surgery. ECF 17-1, at 16–17. Turner offers no argument in opposition. *See* ECF 19. Additionally, Dr. Getachew argues that he is entitled to summary judgment as to Turner's claims regarding denial of medical care in regard to his pacemaker and cardiogram. ECF 17-1, at 19–22. The Court will address each argument in turn.

### A. Res Judicata

*Res judicata*, also known as claim preclusion, is a legal doctrine that promotes judicial efficiency and the finality of decisions. *In re Microsoft Corp Antitrust Litig.*, 355 F.3d 322, 325 (4th Cir. 2004). Under the doctrine of *res judicata*, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979); *see Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008). *Res Judicata* precludes parties from "contesting matters that they have had a full and fair opportunity to litigate," thereby conserving judicial resources and minimizing the possibility of inconsistent decisions. *Montana*, 440 U.S. at 153–54. The doctrine applies when there is: (1) a final judgment on the merits in a prior lawsuit; (2) an identity of cause of action in both the earlier and later suits; and (3) an identity of parties or their privies in the two suits. *Id.* at 354–55; *see also In re Varat Enterprises, Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996) (affirming that "claim preclusion occurs when three conditions are satisfied: 1) the prior judgment was final and on the merits, and rendered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are identical, or in privity, in the two actions; and, 3) the claims in the second matter are based upon the same cause of action involved in the earlier proceeding").

16

*Res judicata* must ordinarily be pleaded as an affirmative defense, but a court may raise the defense on its own motion if it is "on notice that it has previously decided the issue presented." *Arizona v. California*, 530 U.S. 392, 412 (2000); *accord Clodfelter v. Republic of Sudan*, 720 F.3d 199, 208–10 (4th Cir. 2013); *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 (4th Cir. 2006). Such an action is warranted based on one of the underlying purposes of *res judicata*, "avoidance of unnecessary judicial waste." *Arizona*, 530 U.S. at 412. "For purposes of *res judicata*, a summary judgment has always been considered a final disposition on the merits." *See Adkins v. Allstate Ins. Co.*, 729 F.2d 974, 976 (4th Cir. 1984) (affirming grant of summary judgment on *res judicata* grounds where plaintiff did not appeal the prior judgment and instead instituted a second suit). Where the summary judgment "ruling hinged on a quintessential merits decision: whether the undisputed facts established all the elements" of a plaintiff's claim, the judgment is a final one for purposes of *res judicata*. *Brownback v. King*, 592 U.S. 209, 216 (2021).

With respect to Turner's claim that Dr. Getachew denied his knee surgery, Dr. Getachew points to an earlier case before this Court wherein Dr. Getachew was granted summary judgment on this same claim. *See Turner v. Getachew, et al.*, Civ. No. BAH-22-3133 (D. Md. 2022) (hereinafter *Turner I*). *Turner I* was filed on December 1, 2022, and named Dr. Getachew (and others) as defendants alleging, among other things, that Dr. Getachew denied Turner the same left knee surgery he alleges he was denied in the instant lawsuit. *Turner I*, ECF 1, at 13. On July 3, 2024, the Court granted Dr. Getachew's Motion to Dismiss, or in the Alternative, for Summary Judgment in case number 22-3133. *Turner I*, ECF 23. In so doing, the Court acknowledged Turner's argument that he had yet to have knee surgery despite an alleged agreement that if Turner refrained from self-harm Dr. Getachew would ensure he received it. *Turner I*, ECF 23, at 2. In

granting Dr. Getachew summary judgment regarding Turner's knee surgery claim, the Court

found:

> Contrary to Turner's assertions, Dr. Getachew was not responsible for approving Turner's
> knee surgery when it was recommended in 2018. Nor was Dr. Getachew responsible for any
> delay in having that surgery scheduled. Rather, Turner's medical records show that when
> Dr. Carls recommended Turner undergo surgery to remove the bursa in his knee, it was
> medically necessary for Turner to first be cleared by a cardiologist given Turner's
> established heart issues. While some delay occurred in scheduling Turner's evaluation by a
> cardiologist, during this same delay Turner repeatedly engaged in self-harm by cutting
> himself and removing sutures, thus reopening his wounds. As such, his medical providers
> reasonably believed that there was a risk that he would remove his surgical sutures if the
> knee surgery proceeded.
>
> With this background in mind, Turner's care providers convened a multidisciplinary care
> committee to determine the best means to treat Turner's multiple health issues taking into
> account his self-injurious behavior. Turner participated in the care conference and agreed
> with the committee that he could only move forward with both treatment for HCV and his
> knee surgery if he complied with his medical and psychiatric treatments and refrained from
> self-harm for a period of six months. However, Turner unfortunately was unable to do this.
>
> . . . [T]he record evidence demonstrates that Turner's bursitis fortunately resolved on its
> own, thus obviating the need for surgery. While Turner maintains that the referral for surgery
> in 2018 should have been effectuated, his medical providers disagreed and found that the
> lack of observable swelling or diminished range of motion in Turner's knee reflected that
> the bursitis resolved on its own. While the Court is mindful of Turner's understandable
> frustrations with his delay in recommended treatment and acknowledges that he may have
> rightfully been confused as to why no knee surgery was scheduled, none of the named
> Defendants were responsible for that delay or deliberately indifferent to his serious medical
> needs in delaying the surgery. As such, they are each entitled to summary judgment.

*Turner I*, ECF 23, at 27–28. Judgment was entered in favor of Dr. Getachew. *Turner I*, ECF 24.

Here, Turner again sues Dr. Getachew for the alleged failure to provide Turner knee

surgery pursuant to the terms of an alleged deal. Thus, both the parties and the cause of action

regarding the failure to schedule Turner's knee surgery are identical. *Montana*, 440 U.S. at 153–

54. Plus, *Turner I* was a final judgment on the merits, which Turner did not appeal. As such,

*Turner I* represents a valid final judgment and Turner's claim regarding the scheduling and denial

of knee surgery is precluded by *res judicata* and must be dismissed.

### B. Injunctive Relief

Turner also seeks injunctive relief. A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Failure to establish one of these elements is fatal to the request for injunctive relief. For the reasons discussed below, Turner has failed to demonstrate the likelihood of success on the merits. Therefore, his request for injunctive relief must be denied.

### C. Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff

were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–38 (1994); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see, e.g., Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual

knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Dr. Getachew does not suggest that Turner's heart conditions are not serious medical needs, thus satisfying the objective component of the relevant standard. However, the record before the Court—which, again, Turner fails to challenge—does not support the claim that Dr. Getachew was deliberately indifferent to Turner's medical needs. First, Dr. Getachew was not Turner's primary care provider and was not responsible for scheduling Turner's medical care. ECF 17-2, at 2 ¶ 4 ("I was never the patient's primary provider, but I did see him occasionally for telemedicine chronic care visits."). Next, the record evidence demonstrates that Turner no longer has a pacemaker, and therefore, periodic interrogation of the device is not medically necessary. ECF 17-9, at 11. As to the scheduling of an echocardiogram, Turner's medical record demonstrates that the follow up testing and cardiac care were delayed due to scheduling issues, at least once due to court appearances. ECF 17-2, at 19 ¶ 47. However, relevant to the allegations before the Court, which are solely against Dr. Getachew, the record confirms that any delay was neither caused by nor the responsibility of Dr. Getachew. *See* ECF 17-2, at 17 ¶ 43 (affirming that Dr. Getachew "[did] not review consultation requests or schedule offsite visits" and "had no involvement in the delay in the patient seeing a cardiologist and having an echocardiogram"); *see also* ECF 17-2, at 15 ¶ 37 (citing ECF 17-14, at 12–13) (noting issues with hospital scheduling system); *id.* at 16 ¶ 40; *id.* at 16–17 ¶ 42. Indeed, the record reflects that Dr. Getachew frequently addressed Plaintiff's cardiac care needs or referred Plaintiff to see outside providers. *See, e.g.*, 17-2, at 8 ¶ 20, at 9 ¶ 24, at 10 ¶ 27, at 12 ¶ 32, at 13 ¶ 33, at 13–15 ¶¶ 35–36, at 15 ¶ 37, at 16 ¶ 41, at 19 ¶ 47, at 19 ¶ 48. Also, Dr. Getachew's affidavit and Turner's medical records demonstrate that when he was

seen by the cardiologist, he did not have any active cardiac problems and was directed to follow up in one year. *See id.* at 20–21 ¶¶ 51–52; ECF 17-11, at 25 (summarizing visit with Dr. Trost and confirming "no present or active cardiovascular issues at this time"). Thus, the undisputed record evidence demonstrates that Turner's heart condition has been followed by medical staff, and he has received diagnostic assessments, expert consultations, medication, and surgical follow up. There is no evidence that Dr. Getachew was deliberately indifferent to Turner's serious medical need, and he is entitled to summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motions, ECFs 15, 17, construed as motions for summary judgment, are GRANTED.  Judgment will be entered in favor of Dr. Getachew.

A separate Order follows.


Dated: _February 12, 2026___                                    ___/s/_____
                                                                Brendan A. Hurson
                                                                United States District Judge